UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JULIA JAMES,

       Plaintiff,        **REPORT AND**
                       <u>**RECOMMENDATION**</u>

  - v -

                        CV-01-1106 (ARR)(VVP)

FEDERAL RESERVE BANK OF NEW
YORK,
       Defendant.
-------------------------------------------------------------------x

POHORELSKY, Magistrate Judge:

  Following the settlement of this extended litigation, the court was apprised of facts that raised substantial questions about the conduct of the plaintiff's counsel, David C. Wims, Esq., with respect to the distribution of the settlement proceeds to his client, and his conduct during a discussion about that issue at a conference with the court where the settlement was finalized. Specifically, the court learned from the defendant's counsel that the division of the settlement proceeds between Wims and the plaintiff deviated sharply from the understandings of both the court and the defendant's counsel about that matter, understandings that stemmed primarily from what Wims had said, and had not said, during settlement discussions and at the conference. As a result of the revelations, the court has conducted two hearings to obtain the facts concerning the distribution of the settlement proceeds and the misunderstandings about the issue. The facts and the court's conclusions, including a recommendation for action to be taken by the court, are set forth below.

## FACTS

  A brief history of this litigation is necessary to provide perspective for the events that are under scrutiny. This action was filed in 2001. The plaintiff's original pleadings asserted

numerous claims under federal and state law alleging discrimination and retaliation on the basis of gender, race, disability and color arising out of conduct dating as far back as 1987. The defendants promptly moved to dismiss the claims. After briefing had been completed, but before decision was rendered, the plaintiff discharged her initial attorney, Noah Kinigstein, Esq., and began representing herself in late 2001. For the ensuing six years, through protracted proceedings including numerous conferences, discovery, various motions, two attempted interlocutory appeals to the court of appeals, and summary judgment proceedings, the plaintiff continued to act *pro se* until she retained Wims in March of this year.[1]

Summary judgment proceedings concluded in December 2007, with a decision granting in part and denying in part the defendant's motion for summary judgment. As a result of the decision, two retaliation claims remained to be tried. Judge Ross thus referred the case to me to conduct settlement negotiations and, if unsuccessful, to oversee preparation of a pretrial order.

In accordance with Judge Ross's referral, a settlement conference was held on January 10, 2008 during which I had extensive *ex parte* discussions separately with the plaintiff and counsel for the defendant.[2] As a result of the discussions, after the parties had substantially narrowed the gap between the plaintiff's expectations and what the defendant was willing to offer, the defendant made its final settlement offer of $125,000 on the clearly expressed understanding that it was a last, best offer. The plaintiff did not accept the offer. Several weeks later, however, after the court had granted the plaintiff's renewed application for the appointment

---

[1] In September 2004, the court appointed counsel to assist the plaintiff for the limited purpose of mediation which ultimately proved unsuccessful.

[2] I had participated in previous settlement discussions with the plaintiff and the defendant in May 2007 during a two-and-a-half hour session, most of which was spent with the plaintiff *ex parte*.

of pro bono counsel but before pro bono counsel had been obtained, the plaintiff addressed a letter to the court seeking to reconvene settlement discussions. The court thus scheduled a settlement conference for March 18, 2008.

On March 17, 2008, Wims filed his notice of appearance on behalf of the plaintiff and appeared on her behalf at the conference on the following day. At his request, settlement discussions were postponed to permit him to familiarize himself with the case. When the court reconvened on April 9, Wims announced a demand for settlement that had increased substantially over the last amount the plaintiff had indicated she was willing to accept during the conference with the court in January, and discussions therefore terminated quickly. The court issued a schedule for the preparation of a pretrial order, and set a final pretrial conference in early June for submission of the order.

In early May, however, the court received advice from Wims that the matter had settled, coupled with a request that the schedule for the preparation of the pretrial order be extended to permit the parties to prepare and execute the settlement documents. Several weeks later, Wims again wrote to the court requesting that a settlement conference be held on May 30, 2008 when the anticipated settlement could be placed on the record.

The requested conference was indeed held on May 30, and the events at the conference are central to the court's decision here. At the outset of the conference, the parties advised the court that a question had arisen as to how the settlement proceeds would be paid out. The settlement, which had been reduced to a written agreement, contemplated the preparation of two checks, one for attorneys' fees and one ostensibly for benefit of the plaintiff. The question brought to the attention of the court concerned who was to be named as the payee on the latter

check; there was no dispute that the check for attorneys' fees was to be made payable to Wims alone. As to the latter check, Wims did not wish to have the check made payable solely to the plaintiff. May 30 Tr. at 4-5.[3] Rather, he wished to have the check made payable to him as that was his "standard procedure." *Id.*[4] In an effort to resolve the question the court suggested, and counsel for both the plaintiff and the defendant agreed, that the check be made payable to Wims and the plaintiff jointly.

During a brief recess while the defendant's counsel was outside the courtroom obtaining an answer by telephone to one final question concerning the settlement, the plaintiff herself sought to address the court concerning the payment of the settlement proceeds. Specifically she asked why the settlement check had to be sent to her attorney.[5] While waiting for the defendant's counsel to return so that the matter could be discussed in his presence, Wims and the plaintiff conferred privately. Upon the defendant's counsel's return, Wims informed the court that he had explained the issue further to the plaintiff, that payment to him was "the standard procedure" that he usually followed "to close a file and . . . make sure that full compliance has

---

[3]"May 30 Tr." refers to the transcript of proceedings before the court held on May 30, 2008; the two other transcripts cited in this opinion are similarly identified by the date of the proceedings.

[4]In his words,

> Normally in situations such as this as plaintiff's counsel, in order to close the file and make sure that all disbursements are in accordance with the settlement agreement in that the terms of both the settlement agreement and any representation agreement I have with my clients have been fully executed and complied with. That's the standard procedure.
> I have never had, your Honor, a situation where the check was made directly payable to my client.

May 30 Tr. at 5:14-22 (the numbers following the colon refer to the specific line numbers on the page).

[5]The discussion is found at May 30 Tr. at 9:16 to 10:10.

been executed prior to conclusion of the matter," May 30 Tr. at 11:18-23, and that the plaintiff approved.

Picking up on what Wims had said, the court sought to assure the plaintiff as follows:

> THE COURT: Okay. So let me say that that's the normal practice and you're entitled to all of the funds that are made payable to you and Mr. Wims jointly, since he has a separate check that is going to be made to him with respect to attorney's fees.
> So all of the funds that are represented by the check that is going to be made payable to you and to Mr. Wims are your funds. And you will get all of them and Mr. Wims, to the extent that you don't, you just have to let me know. But I am confident Mr. Wims is going to give you all of those funds and he'll turn them over appropriately.
> But that is the normal course and it's a good way for him to keep track of precisely what happened in this transaction and to be able to report it to whoever he has to, if he ever has to report it to somebody because there are procedures in place to keep track of what attorneys do with funds that belong to their clients.
> So, you know, this is a way that he will be able to maintain a financial record that proves precisely what happened to the funds that went to you. Do you understand that, Ms. James.

May 30 Tr. at 12:1-23.

The plaintiff then asked whether the check would be a two-party check, and the court assured her that it would be. The court sought to clarify with Wims precisely how the proceeds would be disbursed, and Wims confirmed that he would deposit the funds into his escrow account and then immediately write a check drawn on that account made payable solely to Ms. James. Wims further confirmed that the entire transaction would occur on the same day. May 30 Tr. at 12-14. The court thus provided a further explanation to Ms. James in the following exchange:

> THE COURT: So Ms. James, basically you will go to Mr. Wims' office when he gets notice that the check has come. He will call you up and you will go to his office. You will sign, you'll endorse the check. He'll endorse the check. And on that same day, he'll provide you with a check out of that account that he

-5-

>           is going to put that check into which will be made payable solely to you and then
>           it's yours. You will be able to negotiate that check immediately.
>
>                   MR. WIMS: Yes, your Honor.
>
>                   THE COURT: Okay.
>
>                   MR. WIMS: Immediately.
>
>                   THE COURT: So there will be no delay in terms of your getting the
>           funds. You will get all of the funds. There will be – Mr. Wims won't be taking
>           any money out of that check, okay?

May 30 Tr. at 14:11 to 15:1.

Before adjourning, the court obtained acknowledgments from all the parties that they had read and signed the written agreement. Because the terms of the settlement were contained in the written settlement agreement, however, the parties did not advise the court of the various terms of the settlement or the amounts of the two checks. The court has since learned that the check for attorney's fees made payable solely to Wims was in the amount of $8,000, and the check constituting the settlement proceeds to Ms. James was in the amount of $125,000.

The defendant thereafter forwarded the checks to Wims in accordance with the settlement agreement, but on July 8, 2008 the plaintiff called the defendant's counsel to complain that Wims had not paid her the full $125,000; he had instead given her only $101,750. In response to the defendant's counsel's request, the plaintiff provided counsel with documentation concerning the issue, including among other things a copy of a retainer agreement between the plaintiff and Wims and copies of the two checks she had received from Wims. Believing that the court had been misled, as they themselves had been, about the distribution of the settlement proceeds, the defendant's counsel advised the court of the matter by letter dated July 10, 2008 and provided the court with copies of the documents they had received from the plaintiff. Upon reviewing the

transcript of the May 30 hearing, the court promptly scheduled a hearing to explore the facts and obtain an explanation for how the court had been misled into believing that the plaintiff would receive the entire proceeds of the check that was made payable jointly to her and Wims.

The hearing commenced on July 21, 2008, and continued on August 28, 2008 because the plaintiff was in the hospital and unable to appear in person on July 21. The defendant's counsel presented the court with all of the e-mail correspondence between them and the plaintiff's counsel leading up to the settlement.[6] Those communications reflect that the defendant was unwilling to pay more than the $125,000 that had been offered to the plaintiff before she had retained Wims, and made that clear to Wims at the outset of the negotiations that led to the settlement. Wims thus asked whether the defendant would be willing to pay that amount *plus* attorneys' fees and costs. When the defendant indicated that it would be willing to pay some additional amount for that purpose the parties, through counsel, reached agreement that the amount would be settled for $125,000 plus $8,000 in attorneys' fees and costs. Nothing in the correspondence contains any suggestion that Wims had a retainer agreement that would entitle him to any portion of the $125,000, and the defendant's counsel understandably concluded that the $8,000 constituted Wims's entire compensation. See Ex. 1, Tab 4.

At the hearing, the plaintiff acknowledged that she had indeed entered into the retainer agreement with Wims that she had provided to the defendants' counsel. July 21 Tr. at 6. The agreement provided for the payment of fees on a contingency basis, with Wims receiving "1/3 of any and all recovery if the case goes to trial and 25% of any and all recovery if resolved through

---

[6]The defendant's counsel presented the court and opposing counsel with a binder of documents relating to this issue which the court has marked as Exhibit 1. The e-mail correspondence is found at tab 4 of Exhibit 1.

settlement." Representation Agreement (annexed to Federal Reserve Bank of New York Letter to the Court dated July 10, 2008 (hereinafter "Fed. Ltr."), at Ex. 1, Tab 3). Although she and Wims had discussed the proposed settlement terms when settlement communications between Wims and counsel with the defendant resumed in late April and early May, she said that she and Wims had not discussed the retainer agreement again, or the question of Wims's fees, at any time before the May 30 conference with the court. She stated that she had become dissatisfied with the "direction" in which Wims had taken the case before the May 30 conference, and had verbally fired him, but had not had the money to file papers to have him relieved. July 21 Tr. at 8-9. When asked whether Wims had told her what portion of the settlement proceeds would go to her, she stated that Wims had said nothing about that and that when she heard the court explain that she would get all of the proceeds from the check made jointly payable to her and Wims she did not feel the need to discuss the question further at the May 30 conference.[7] July 21 Tr. at 11; Aug. 28 Tr. at 7.

The plaintiff did raise the retainer agreement and the question of Wims's fee, however, in an e-mail communication she sent to him on June 5. E-mail from Jjames1609@aol.com to davidwims@hotmail.com, June 5, 2008 (annexed to Fed. Ltr. at Ex. 1, Tab 3). In the e-mail, the plaintiff asserted among other things that Wims had not adequately represented her, that she considered the retainer agreement void, that Wims did not deserve 25% of the settlement, but

---

[7]At the continuation of the hearing on August 28, the plaintiff produced a calendar in which she said she made notes of important business matters including conversations with her attorneys. Aug. 28 Tr. at 6-7. The calendar contained three entries concerning the case during the period prior to May 30 which reflected communications between her and Wims on April 28, May 2, and May 13. The entries contain limited information about the subjects of discussion but provide few details. A copy of the relevant pages from the calendar, redacted to eliminate notes about matters unrelated to the case, is marked as Exhibit 2.

that she was willing to "workout a lesser amount." *Id*. The e-mail also addressed the question of paying her prior attorney, Mr. Kinigstein, and admonished Wims not to give any of the settlement proceeds to Kinigstein since she would make her own arrangements after speaking with him. Although the e-mail refers to a conversation between the plaintiff and Wims that had occurred on June 4, the plaintiff could not remember the substance of that conversation.

The plaintiff did recall a conversation with Wims that occurred *after* she sent him the e-mail in which they discussed the question of paying Kinigstein. Wims advised the plaintiff that Kinigstein had agreed to settle his lien on the settlement proceeds for $8,000. Wims proposed that he would pay Kinigstein the $8,000 that had been separately paid by the defendant for attorneys' fees, and that Wims would take his own fee out of the settlement proceeds as provided in the retainer agreement. Aug. 28 Tr. at 18. Anxious to resolve the matter because of her own financial hardship, the plaintiff authorized Wims to pay Kinigstein $8,000 after receiving a copy of a letter faxed by Kinigstein to Wims, dated June 6, 2008, which confirmed his agreement to release the lien upon receiving payment in that amount. Aug. 28 Tr. at 19-20; see Letter of Noah A. Kinigstein, June 6, 2008 (annexed to Fed. Ltr. at Ex. 1, Tab 3). The plaintiff told Wims, however, that she did not agree with his proposal to take 25% of the settlement proceeds since she did not believe he was entitled to that. She thereafter had no further discussion with Wims about that issue before contacting the defendants' counsel approximately one month later in early July. Aug. 28 Tr. at 21. On or about June 6, 2008, the plaintiff received a total of $101,750 in settlement proceeds which were disbursed to her by two checks drawn on Wims's account. See Letter of David Wims, June 6, 2008 (annexed to Fed. Ltr. at Ex. 1, Tab 3).

Wims's account of the events surrounding the retainer agreement and the payment of his fee differed from the plaintiff's in only a few respects, but he was able to provide additional details concerning the division of the settlement proceeds. He was not certain whether he had a discussion with the plaintiff about the division of the settlement proceeds, including his 25% fee, before the May 30 conference. *Compare* July 21 Tr. at 22 *with* Aug. 28 Tr. at 6.[8] He did confirm, however, that the first time the plaintiff complained to him about the amount of the fee he would take from the settlement proceeds occurred in a conversation some time after the May 30 conference in which she said she wanted to negotiate an amount less than the 25% called for in the retainer agreement. Aug. 28 Tr. at 28.

He recalled other conversations after May 30 as well, including one conversation in which he advised her of Kinigstein's lien and received her approval to negotiate the lien with Kinigstein and another in which she authorized him to pay Kinigstein in satisfaction of the lien. In the context of the latter discussion, Wims said he explained to the plaintiff that, in accordance with her desire to renegotiate the 25% fee, he would reduce his fee by paying Kinigstein's lien out of his portion of the settlement proceeds rather than hers. Aug 28 Tr. at 28-30.[9] In addition, with the plaintiff's consent and on the understanding that Wims would be responsible for the

---

[8] Wims provided details about the discussion including the fact that the plaintiff used a calculator to compute the specific amount of the 25% fee. July 21, 2008 Tr. at 22. James categorically denied that this occurred, stating instead that Wims did calculations and told her what she would receive in a discussion that transpired after the May 30 conference.

[9] The retainer agreement does not address fees to other attorneys or other litigation expenses, but simply states that Wims would receive 25% of "any and all recovery if resolved through settlement." Representation Agreement at p. 2 (Ex. 1, Tab 3). Since Wims paid Kinigstein's lien out of his share, he arguably received $8,000 less than what he was otherwise entitled to receive.

payment of fees, Wims brought in another attorney to assist him in this matter, to whom he paid $2,000 out of his share. *Id*. at 32.

## DISCUSSION

As an initial matter, the above facts establish that the misunderstandings by the both the court and the defendant's counsel about the distribution of the settlement proceeds were the direct product of conduct undertaken by Wims to achieve that result. That the defendant's counsel believed the plaintiff was supposed to receive the full $125,000 is clear from the e-mail communications between Wims and the defendant's counsel leading to the settlement. The defendant had already taken the position that they would pay no more than $125,000 to settle the case. Wims convinced them to reconsider their position by suggesting an extra payment to cover his fees, and the negotiations thereafter centered only on fixing the amount to be paid for his fees. Moreover, the fact that the settlement was structured to provide two payments – one for fees and one for settlement proceeds – leads ineluctably to the conclusion that the funds would be divided between counsel and the plaintiff on those lines. The misapprehension by the defendant's counsel and ultimately by the court about the division of proceeds was thus not a mere mistake; it was a mistake that Wims expected would be made.

The court's conclusion that Wims intended to deceive counsel and the court about this matter is proved by his conduct at the May 30 settlement conference. When the court sought to reassure the plaintiff that the manner in which the check for her portion of the proceeds was to be disbursed was appropriate, and that she would receive all of the funds from the check that was to be made payable jointly to her and Wims, he knew that the court was laboring under a misunderstanding. The question of the division of proceeds was addressed not once, but twice,

-11-

and the court's explanation to the plaintiff about the point was clear and unambiguous. Yet, instead of advising the court of the error, as he had an obligation to do, he stood mute.

Wims seeks to explain his failure to correct the court's misunderstanding by arguing that the representation agreement between him and his client was privileged, and that his client could have advised the court of the existence of the agreement. Wims Letter, Oct. 29, 2008, Dkt. Entry 202. The argument is entirely unpersuasive. He offers no support for the notion that his agreement with his client was privileged, and under long-established federal and New York law such agreements are not privileged absent exceptional circumstances not present here. *See, e.g., In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21, 1985*, 793 F.2d 69, 71-72 (2d Cir. 1986); *Priest v. Hennessy*, 51 N.Y.2d 62, 69, 409 N.E.2d 983, 986-87, 431 N.Y.S.2d 511, 514-15 (1980). Upon review of the retainer agreement here, the court finds nothing in the agreement that would remotely qualify for application of the attorney-client privilege. In any event, even if Wims honestly labored under the erroneous impression that the agreement itself was privileged, the *fact* that he and his client had such an agreement is clearly not privileged, and Wims could have simply asked for an ex parte conference with the court involving only him and his client where the issue of privilege could have been raised and resolved rather than allow the court to mislead his client.

The court is convinced that the true reason Wims stood mute is that he knew how the court and the defendant would react upon learning he would be taking a fee in excess of $30,000, rather than the $8,000 he had led everyone to believe he would receive. Such a revelation ran the risk of upsetting the settlement itself, since the defendant could well have balked if it learned how they had been deceived. He also must have realized (correctly) that the court would have

had grave concerns about the amount of the fee he would be taking in light of his limited involvement in the case and the fact that the plaintiff had obtained the same $125,000 settlement offer before he became counsel. And he certainly knew that once the issue was raised in open court, his client would likely have challenged the amount of his fee with the court, given her dissatisfaction with his efforts. Such a challenge would have required Wims to justify the amount of his fee, not an easy or enviable task in the circumstances.

The plaintiff is not entirely blameless, to be sure. Her questions at the May 30 conference about how the settlement proceeds would be paid reflected her concerns that the retainer agreement might well affect the amount of proceeds she would actually realize. Although she now says that her concerns about whether she would have to share any of the $125,000 check with her counsel were put to rest by the court's assurance to the contrary at the May 30 conference, her conduct in the days shortly after the conference shed some doubt on how much she had relied on the court's statements. Her offer to Wims in her e-mail to him in early June that she would be willing to work out a lesser fee suggests a continued concern that she had a contractual obligation to him notwithstanding what the court had expressed at the May 30 conference. But the plaintiff's failure to raise the issue at the conference cannot be compared with Wims's failure. She is not an officer of the court and she was not trained in the law. She had no duty to correct the record. He did. Had he done so, the entire matter could have been addressed then, and a solution to the issue would likely have been found through discussions with all those involved. That would have been far more preferable for all concerned than the posture in which the issue is now presented to the court.

# RECOMMENDATION

The failure by the plaintiff's counsel to correct the record concerning the disposition of the settlement proceeds requires the court to take action. By standing mute, Wims involved the court in perpetuating a deceit of both his own client and the defendant with respect to the matter. A failure by the court to take action would constitute tacit approval of Wims's lack of candor with the court, and of the kinds of sharp practices concerning fees for which attorneys are rightly condemned. The proper result here, then, should be to put the parties in precisely the position that Wims, by his silence, approved and accepted. The plaintiff should receive the full amount of $125,000 which the court told her she would receive, less the $8,000 she authorized Wims to pay to her prior attorney. Wims should receive the $8,000 which was designated as his attorneys' fees, out of which he is responsible for the $2,000 he paid to the attorney he brought in for assistance.

The above result is justified under ordinary principles of contract. Wims's silence while the court set forth the distribution of the settlement proceeds constitutes consent to a modification of the representation agreement insofar as it concerns his fees. *See* 2 *Williston on Contracts* § 6:53 (4th ed. 2008) (in situation where silence indicates assent, offeree who keeps silent knowing his silence will be misinterpreted should not be allowed to deny the natural interpretation of his conduct); Restatement (Second) of Contracts § 69(1)(c) (1981) (silence operates as acceptance "where because of previous dealings *or otherwise*, it is reasonable that the offeree should notify the offeror if he does not intend to accept") (emphasis added).

The result is also justified under the court's inherent power to protect clients from excessive fees. *See generally In re Goldstein*, 430 F.3d 106 (2d Cir. 2005) (court has inherent

power to inquire into fee arrangements to protect clients from excessive fees); *In re Michaelson*, 511 F.2d 882 (9th Cir. 1975) (same). There is no question that a fee of more than $33,000 (or even $25,000 after taking into account that Wims paid Kinigstein out of his share), is excessive in view of the limited work Wims performed and the absence of any success attributable to his efforts. Although no evidence was offered concerning the extent of any work he performed, it could not have involved more than a few hours reviewing the docket and prior rulings in the matter, and perhaps some documents provided by the plaintiff. The settlement discussions with the defendant's counsel, reflected in the e-mail communications, were neither extensive nor time-consuming. Even if Wims spent as much as 20 hours on the matter, a fee of $25,000 would be out of all proportion to the value of his services.

Accordingly, I recommend that the court enter an order requiring Wims to pay over to the plaintiff Julia James a total of $15,250, which constitutes the difference between the amount she actually received ($101,750) and the amount of the proceeds designated as hers pursuant to the settlement agreement, less the amount she paid to her prior lawyer to satisfy his lien ($125,000 - $8,000 = $117,000).

\*       \*       \*       \*       \*       \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
November 13, 2008